THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* HERBERTO FLORES *et al.*, Defendants-Appellants.

First District (5th Division)    No. 78-1993

Opinion filed December 28, 1979.

James J. Doherty, Public Defender, of Chicago (Michael McInerney and Ira Churgin, Assistant Public Defenders, of counsel), for appellants.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, James S. Veldman, and Alfonse R. Tomaso, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE WILSON delivered the opinion of the court:

After a jury trial, defendants, Herberto and Maria Flores, were found guilty of robbery (Ill. Rev. Stat. 1975, ch. 38, par. 18—1) and unlawful restraint (Ill. Rev. Stat. 1975, ch. 38, par. 10—3) and were both sentenced to concurrent terms of 3 to 9 years for robbery and 1 to 3 years for unlawful restraint. Maria Flores' robbery sentence was later reduced to a term of 1 to 5 years. On appeal, they contend (1) that they were not proven guilty beyond a reasonable doubt and (2) that certain rebuttal argument remarks of the prosecutor were prejudicial. Additionally, Herberto Flores contends that the trial court erred in sentencing him

without exercising its discretion with respect to whether he should have been treated under the Dangerous Drug Abuse Act (Ill. Rev. Stat. 1975, ch. 91½, par. 120.1 *et seq.*) as an alternative to incarceration. We affirm the convictions but remand on the sentencing question.

. Defendants first contend that they were not proven guilty beyond a reasonable doubt of robbery and unlawful restraint. They argue that the testimony of Enrique Rivera, the complainant, was "incredible, contradicted on certain vital questions, and uncorroborated." We disagree.

Rivera, who spoke Spanish and understood very little English, testified at trial through an interpreter. He testified that on September 20, 1976, he left work at Division and Cicero streets at about 11:15 p.m. On the way home, he developed problems with his automobile lights and had to pull his car over to the side of a road and repair the lights. At about 2:30 a.m., he completed the repair work and continued on his way home.

Before arriving at his home in the 2700 block of Wabansia, Rivera stopped at the Park View Steak House restaurant at North and California Avenue for "a beer or two." He said that he entered the bar portion of the restaurant at about 3:30 a.m. While he was drinking, a woman and a man, whom he identified as defendants Maria and Herberto Flores, came into the bar and sat down beside him. Maria asked him if he would buy her a beer. He agreed and also offered to buy Herberto a drink, but Herberto did not accept the drink. A little later, Herberto asked Maria to ask him for a ride home. After Maria told him that they lived in the same area, around Wabansia, he agreed to give them a ride.

They left the bar together at about 4 a.m. and went to Rivera's car. When they arrived at the car, Herberto told Maria to sit in the front seat and said that he would sit in the back. Herberto sat right behind Rivera. Rivera drove them east down North Avenue and then turned north about two blocks east of Washtenaw. As they were approaching Wabansia or when they had entered Wabansia, Herberto grabbed Rivera by the neck with something "shiny" and told him, "watch it, no move." Soon, Rivera pulled his car over to the side of the street. Herberto, who continued to hold him around the neck with the shiny object placed near to his face, then told Maria to search him. During the search, Maria took $2 and a watch from him. She also took his wallet and threw it in the car. Then, either both of them or Herberto pulled him from the car and took him into an alley. In the alley, Herberto asked him where he kept his money. When he told Herberto that he had none, Herberto started punching him. At some point, Maria came over and told Herberto to stop hitting him. However, they grabbed him, took his belt, and tied his hands behind his back. Herberto pushed him against a wall and he fell to the ground. While he was sitting on the ground they took his shoes and Maria searched them

to see if there was any money. At that point, someone, who had apparently heard the noise in the alley, called out, "what is happening?" Herberto and Maria then fled.

After waiting a while, Rivera, who was still tied and barefooted, ran to his house. He managed to ring the doorbell to his house with his arm and his wife answered the door. He told her to call the police. When the police arrived, Mrs. Rivera, who could speak "some" English, told the police what her husband had told her about what had happened. The Riveras then accompanied the police back to the alley where Rivera was beaten and there they found his shoes in a drum. Nearby, they found his car still running and his wallet lying in the car. Although they did not recover the two dollars or the watch, Rivera said that he did tell the police that they had been taken from him. He also admitted telling the police that he had been drinking at a place at 2004 West Fullerton on that evening.

The only other witnesses called to testify on the events which transpired in the morning hours of September 21 were Officer Robert Tovar and Maria Flores. Officer Tovar testified that at approximately 4:20 a.m. on September 21, 1976, he received a radio call and proceeded to 2751 West Wabansia. When he arrived there, he saw Rivera standing outside with no stockings on his feet. He said that he could not determine if Rivera had any shoes on at the time. Tovar stated that he could not speak Spanish but that he was able to communicate with Rivera through his wife who could make herself understood "fairly well." He said that at the time he was speaking with Mrs. Rivera, both she and her husband appeared upset. After talking briefly with Mrs. Rivera, Tovar and his partner, Officer Nick, drove the Riveras to the alley. There, the officers found Rivera's shoes in one of the drums and also found Rivera's wallet in his car which was parked close to the alley. Tovar drove Rivera's car to his house. He could not remember if the keys were in the car when he got in, but he said that he was not given the keys prior to entering the car.

Tovar testified that he made a police report of the incident. Under a place marked "property taken" in the report, he had written "none." He said that he wrote "none" because that was all that he was aware of at the time he filled out the report. He probably filled out this portion of the report when he was having difficulty communicating with the Riveras. He said that Mrs. Rivera could make herself known to him fairly well but that he would have to go over questions very slowly and make sure that she could "hopefully * * * fully understand them." He was not sure if she could communicate what had actually been taken from her husband. He also stated that in the narrative portion of his report he had indicated that nothing was missing—that everything had been found. He said that once again he was referring to the property of which he was aware.

Tovar also indicated on his report that Rivera was drunk when he observed him. He based this observation on the late hour, Rivera's appearance, and the fact that Rivera had been to a tavern. He did state, however, that he could not recall smelling any alcohol on Rivera's breath.

Maria Flores, who was originally from Puerto Rico, testified that she entered the bar with Herberto, who also was originally from Puerto Rico, but that he went to the washroom before she sat down. She sat down two stools away from Rivera, whom she said she knew was from Mexico, and after a while he said hello to her. After she returned his greeting, he told her that he had stopped at the bar to have a few drinks after work. She said that he did not appear drunk to her. When Herberto returned from the washroom and asked her if she was ready to leave, Rivera offered to drive them home. They agreed and the three of them left the bar together. When they drove up Wabansia, Rivera put his hand on Maria's knee. She gestured for him to remove his hand. Although she did not say anything to Herberto, she partially turned around and she "guessed" that Herberto saw her. Herberto then told Rivera to stop the car. After he did, Herberto grabbed Rivera, pulled him out of the car, and started hitting him. Eventually, Maria came over and told Herberto to stop hitting him. She then said that they should leave and that he should "forget it."

■■ We find that this testimony was sufficient to support the verdicts of the jury. It is well established in Illinois that the testimony of one credible and positive witness is sufficient to sustain a conviction even though the testimony is contradicted by the accused. (*People v. Novotny* (1968), 41 Ill. 2d 401, 244 N.E.2d 182; *In re Winslow* (1977), 46 Ill. App. 3d 962, 361 N.E.2d 622.) A witness' testimony may be credible and positive even if there are minor inconsistencies in his testimony. (*People v. Berry* (1975), 35 Ill. App. 3d 172, 341 N.E.2d 45.) The determination of the credibility of a witness is made by the trier of fact, and we will not reverse a conviction based largely on that determination unless the evidence was so improbable as to raise a reasonable doubt of guilt. *People v. Novotny.*

Rivera's testimony was both credible and positive on all material matters. He positively identified both defendants and his testimony indicates that he had ample opportunity to view defendants. His recitation of the basic facts concerning the robbery and unlawful restraint remained unshaken throughout his testimony. The only real inconsistencies in his testimony involved matters such as whether Herberto grabbed his neck when they were entering Wabansia or when they were approaching Wabansia and whether both defendants or just Herberto pulled him from his car. These matters were no more than minor discrepancies. (*In re Winslow.*) Also, Rivera's recitation of facts was not so improbable as to raise a reasonable doubt of guilt. Defendants have argued that it is "incredible" for Rivera to testify that it took one

hour to drive from the vicinity of Cicero and Division to the area near North and California where the Park View Steak House was located. With respect to that argument, we note simply that even if there were support in the record for such an argument, Rivera only testified to approximate times of departure and arrival.

Defendants argue a number of other reasons why we should consider Rivera's testimony incredible. First, they argue that Officer Tovar's testimony that he thought Rivera was drunk was "noteworthy." Although Tovar did testify that Rivera was drunk, we question this testimony in light of his stated reasons for making such an observation and his failure to recall smelling any alcohol on Rivera's breath. Also it must be remembered that there was no other indication that Rivera was drunk, and, as a matter of fact, Maria testified that he did not appear drunk.

Defendants next argue that Tovar's failure to note the allegedly stolen watch and the $2 in his report and his indication that all property had been recovered casts severe doubt upon Rivera's testimony. We reject this argument because there is credible evidence in the record to explain Tovar's failure to note these items in his report. Rivera testified that he told the police about the watch and the $2. However, his information was being communicated to Tovar by his wife, whose abilities with respect to the English language were somewhat limited. Rivera testified that his wife could speak "some" English. Tovar testified that Mrs. Rivera could make herself known to him fairly well but that he had to go over questions very slowly to make sure that she could understand them. He said that he was not sure if she could communicate what had actually been taken from her husband. We believe that Mrs. Rivera's difficulties with the English language provide a likely explanation for Tovar's failure to mention the watch and the $2 in his report.

Lastly, defendants argue that several important points of Rivera's testimony were uncorroborated. However, we first note that there was no need for corroboration in light of his credible and positive testimony. (*People v. Novotny*; *In re Winslow.*) Next, there was corroboration of his testimony with respect to his wallet being found in his car, his shoes being found in the alley, and his keys being found in the ignition of his car. (See generally *People v. Novotny* for the significance of this type of corroboration.) Last, there was no need for his wife to corroborate his testimony since she could not have testified as to any of the material aspects of the crimes.

Defendants next contend that certain remarks made by the assistant State's Attorney during rebuttal argument deprived them of their right to a fair trial. During rebuttal, the assistant State's Attorney made the following remarks about motive despite the fact that the parties had agreed to give the jury Illinois Pattern Jury Instructions, Criminal, No.

3.04 (1968), which stated that the State did not have to prove a motive: "I said you are going to hear one instruction concerning motive. The People of the State of Illinois does not have to prove motive, that is the law. I don't know why people rob other people when they are practically neighbors; they speak Spanish, all of them, Eddie (Herberto), Maria, Mr. Rivera.

One thing, Mr. and Mrs. Flores are from Puerto Rico. Now, Mr. Rivera told us he is from Mexico. Maybe there is some animosity there, I don't know. I don't know why Mr. Rivera was robbed."

An objection was made by defense counsel at the end of these remarks and the court immediately sustained the objection. However, at no point did defense counsel ask the court to withdraw the jury instruction as a result of these remarks. Defendants claim that these remarks were prejudicial because (1) the State commented upon motive despite the agreement to give the instruction which said that motive did not need to be proven and (2) the State's remarks injected the inflammatory issue of nationality into the case. Although the remarks were improper, we find that they are not grounds for a new trial since they did not constitute a material factor in the convictions.

■ Improper remarks only require reversal if they result in substantial prejudice to defendants. (*People v. Nilsson* (1970), 44 Ill. 2d 244, 255 N.E.2d 432.) The assistant State's Attorney's remarks concerning motive, even though purporting to explain to the jury that motive need not be proven, were improper and should not have been made. (*People v. Manzella* (1973), 56 Ill. 2d 187, 306 N.E.2d 16.) However, in light of the strength of the State's case, we cannot say that the remarks constituted reversible error. *People v. Manzella.*

■ The assistant State's Attorney's reference to nationalities as a possible explanation for defendants' actions was also improper. (*People v. Maria* (1935), 359 Ill. 231, 194 N.E. 510.) There was no basis in the evidence for such a comment, and resort to such references can only be construed as an attempt to arouse the passions or prejudices of the jury. However, unlike the remarks made in cases cited by defendant (*People v. Maria; People v. Turner* (1977), 52 Ill. App. 3d 738, 367 N.E.2d 1365; *People v. Richardson* (1977), 49 Ill. App. 3d 170, 363 N.E.2d 924), this remark was only an isolated comment which was not repeated and cannot be construed as a clear attempt to undermine the judicial process. Furthermore, the strength of the State's case and the trial court's immediate sustaining of defense counsel's objection renders this error harmless.

Lastly, defendant Herberto Flores contends that the trial court erred when it failed to exercise its discretion as to whether he should have been treated under the Dangerous Drug Abuse Act (Ill. Rev. Stat. 1975, ch. 91½,

par. 120.1 *et seq.*) as an alternative to incarceration. The record indicates that the trial court had a presentence report before it at the sentencing hearing. The report stated that:

> "The defendant states that he was addicted to heroin at the age of 21 until incarceration. This is verified by the fact that defendant was enrolled in the West Side Organization, a drug abuse center, from 10-23-73 until 12-23-74 at which time he was dropped for failing to show up at the program. He again enrolled 10-22-75 but was again dropped 11-12-75 because of incarceration."

The report also indicated that on February 14 , 1974, Herberto had been sentenced to one year probation for possession of marijuana and that over the years Herberto had a sporadic work record. During the hearing, defense counsel highlighted this report to the court. In addition, counsel noted that Herberto's enrollment in the drug abuse center in 1975 was only terminated because he was arrested on another charge and that Herberto "has from time to time been addicted to heroin." Despite all of this information, the trial court did not expressly state that it had considered alternative treatment under the Dangerous Drug Abuse Act for Herberto. We find this to be error requiring a remand for a new hearing on sentencing.

Section 10 of the Dangerous Drug Abuse Act (Ill. Rev. Stat. 1975, ch. 91½, par. 120.10) provides:

> "If a court has reason to believe that an individual convicted of a crime is an addict or the individual states that he is an addict and the court finds that he is eligible to make the election provided for under Section 8, the court may advise him that he may be placed on probation if he elects to submit to treatment and is accepted for treatment by the Department."

If a trial court has reason to believe that defendant is an addict, the record must indicate that the trial court has exercised its discretion in determining whether treatment under the Dangerous Drug Abuse Act is warranted. (*People v. Melson* (1976), 36 Ill. App. 3d 71, 343 N.E.2d 258.) Whether a court has reason to believe that a defendant is an addict must be determined from the facts presented in each case. *People v. Newlin* (1975), 31 Ill. App. 3d 735, 334 N.E.2d 349.

■ We find that the information presented to the trial court at the sentencing hearing should have given it reason to believe that Herberto was an addict. The information that Herberto had voluntarily committed himself to a drug abuse program on two instances, the last being less than a year of the date of the crimes, should have prompted the trial court to inquire into Herberto's present condition. This was particularly necessary since it confirmed Herberto's statement to the presentence report examiner that he was addicted to heroin at the age of 21 until his

incarceration and his counsel's statement that he had been addicted to heroin from time to time. The further fact that Herberto had a sporadic work history, when considered in conjunction with the other information, should also have prompted the court to inquire into his present condition. In *People v. Edwards* (1975), 29 Ill. App. 3d 625, 331 N.E.2d 342, we found the fact that the accused was holding a job as an auto mechanic as seeming "to negate any present addiction." (29 Ill. App. 3d 625, 629, 331 N.E.2d 342, 346.) In this case, we find that the sporadic work history of Herberto might indicate that he had some drug dependency which prevented him from having a job.

We affirm the convictions of the defendants, but remand this case to the trial court with instructions to conduct a new sentencing hearing at which the court should exercise its discretion with respect to the applicability of alternative treatment under the Dangerous Drug Abuse Act.

Judgment of conviction affirmed; cause remanded for new sentencing hearing.

LORENZ and MEJDA, JJ., concur.